MICKLE, Judge.
Appellants, Richard and Judy Altilio, appealed from the lower tribunal’s order and final judgment. The defense had made a pretrial offer of judgment totaling $100,-000.00, but the offer was declined and the matter proceeded to trial. The jury found that Appellee, Aletha Gemperline, was 100 percent negligent and was the legal cause of damage to Mr. Altilio in an action arising from an accident in which Mrs. Gemperline’s car hit the back end of Mr. Altilio’s vehicle. Pursuant to the verdict, Mr. Altilio was awarded 1) $13,375.77 for medical expenses incurred for United States Government care from the date of the accident and 2) $1,000.00 for general past damages. The jury re *300 turned zero awards for Mr. Altilio’s future (post-verdict) medical expenses, future lost wages, and general future damages, and zero for Mrs. Altilio’s claim for loss of consortium. The trial court denied the Altilios’ motions for additur and new trial and granted Mrs. Gemperline’s motion for attorney’s fees and costs and amended motion for judgment pursuant to section 768.79, Florida Statutes. We reverse the zero award for future medical expenses and remand for a new trial on that issue and on future damages, if any, relating to the need for future surgery. Finding no error with respect to the other points raised on appeal, we affirm as to each without further discussion.
Where the trial court has denied a motion for new trial alleging the inadequacy of damages, the test for the reviewing court is not what the appellate panel would have decided had it tried the case. Rather, the standard is whether the jurors, as reasonable persons, could have returned the challenged verdict. Griffis v. Hill, 230 So.2d 143, 145 (Fla.1970) (on reh’g granted); Shaw v. Puleo, 159 So.2d 641, 644 (Fla.1964). A jury is free to determine the credibility of medical experts and to decide the weight to ascribe to them as well as to any conflicting lay evidence. Easkold v. Rhodes, 614 So.2d 495, 497 (Fla.1993). Appellants contend that the zero award for future medical expenses is contrary to the manifest weight of the evidence and is, therefore, grossly inadequate. We agree.
The Altilios’ action arose from an October 22,1988, vehicular collision. Mr. Altilio testified that he was stopped at a traffic light when Mrs. Gemperline’s car rear-ended his vehicle and pushed it into a third vehicle ahead. On impact, he went forward in the seat but was restrained by the seatbelt. He felt his neck snap and had a shooting pain down his arm. Altilio received medical attention at the emergency room for neck and back discomfort and weakness in the knees. He was restricted from strenuous physical activity and from lifting over 10-15 pounds for a week. At the time of the wreck, he was 25 years old.
A chiropractor, Dr. Kuhn, treated Mr. Alti-lio six days after the ear wreck and received complaints of neck pain, headaches, discomfort of the shoulder and upper and lower back, dizziness, fatigue, and nausea. By May 1989, Kuhn was able to opine, within a reasonable degree of medical probability, that Altilio had suffered a permanent injury to the supportive structures of the spine. Kuhn made an initial conservative determination that the impairment was 5 percent, but after reviewing a subsequent myelogram and noting the presence of a lumbar fracture, the chiropractor opined that the permanency would be “significantly greater,” 15 percent. While continuing to provide chiropractic treatment, Kuhn referred Mr. Altilio to a neurologist, Dr. Shawbitz.
Mr. Altilio is a technician in avionics (aircraft electronics) in the United States Air Force. On November 28, 1988, about five weeks after the automobile collision, he and a co-worker lifted a 100-pound test station drawer from the floor to a workbench while performing “a normal task” at work, after which Altilio noticed back pain and stiffness. After three days of prescribed bed rest and heat packs, he returned to work, but the lifting restrictions were reinstated. Before and after the lifting incident, Altilio was treating with Dr. Kuhn for low back problems.
Dr. Shawbitz first saw Mr. Altilio on February 10, 1989, and treated him for only about a month. The medical evidence indicates that in mid-March 1989, Shawbitz felt that Altilio probably would require ongoing physical or chiropractic therapy and medications. Although the neurologist did not anticipate then that any surgery was foreseeable or would be necessary in the near future, his medical records did not mention the presence of an avulging compression lumbar fracture of the L5 vertebra body. Furthermore, he was unaware that Altilio had undergone a cervical fusion at the C6-C7 (low neck) level.
Neurologist Dr. White saw Mr. Altilio for an independent medical examination on February 21, 1990. She knew about the car accident, and she related the wreck and the patient’s discomfort from headaches and from pain in the low back, knee, and neck. White subsequently learned about the post- *301 collision lifting incident. The doctor’s review of x-rays and several CAT scans indicated a preexisting congenital small canal where the spinal cord and roots are located; such a condition can make one more susceptible to injury. A whole body myelogram showed a central herniated disk at C6-7 consistent with a traumatic episode like the automobile wreck.
Upon Dr. White’s referral for “possible surgical management of a low back problem,” neurosurgeon Dr. Levine treated Mr. Altilio once, on April 6, 1990. His findings after reviewing the myelogram and CAT scan are consistent with Dr. White’s, and Levine noted the following impression in his medical report:
This is a gentleman who has several abnormalities of his lower back; none of them are severe, however, with the foraminal stenosis bilaterally at L5-S1, complicated by his left paracentral disk herniation at L5-S1, I would think that it is more likely than not, given his young age, that in the future ... he is going to have to have surgery to correct his lower back condition. At this time, I don’t believe that he is symptomatic enough to warrant intervention.
In his deposition, which was read to the jury, Dr. Levine concluded that the likelihood of future low back surgery will depend on Alti-lio’s symptoms and progress over time. Dr. Levine discovered an avulsion compression fracture on the films previously ordered by Dr. Shawbitz. An avulsion fracture is a condition where a ligament that is attached to the bone is under sufficient stress that it pulls off a piece of the bone, whereas a compression fracture indicates that the bone is crushed. Levine opined that Mr. Altilio’s injuries are more consistent with a traumatic event than with a bending and lifting injury. None of the physicians testified that Mr. Altilio’s avulsion fracture is attributable to the lifting incident. Dr. Levine’s review of the medical studies indicated that, more likely than not, Altilio will undergo surgery with continued complaints. Specifically, Levine testified that Altilio will need separate procedures that can be performed at the same time: 1) widening of the congenitally narrow spinal canal and 2) opening of nerve openings at L5-S1. The doctor stated that such procedures cost around $25,000.00.
Air Force neurosurgeon Dr. Foody first saw Mr. Altilio on July 25,1990. He testified that the CAT scan of the lower back was “definitely not normal,” and that the MRI report indicated multiple disc bulges that could have been caused or aggravated by trauma. He found a herniation in the lower part of the neck and discerned evidence of a fracture at the L5 vertebra. In early November 1990, Foody performed a diskecto-my. Altilio seemed better for a time but experienced recurrent pain. Foody was hesitant to recommend any additional lower back surgery due to the involvement of multiple discs, as the removal of any one of those discs may not relieve the pain. As to potential neck surgery, the doctor found no evidence of an operable lesion, but he did not know whether the back or neck conditions might worsen. The disc bulges will remain, but Foody could not determine whether the pain will continue. Shortly before the last treatment in mid-November 1991, Foody recommended that Altilio meet with a medical board due to Altilio’s inability to perform the physical activity required by the Air Force. At the specific request of the military, Dr. Foody had no opinion as to the issues of a disability rating or the existence of a permanent injury. However, he related the disc bulges, diskectomy, and lumbar fracture to problems caused by the automobile accident.
At the final visit with Dr. White, on January 25, 1991, Mr. Altilio underwent another independent medical examination. The doctor found that two and one-half months after surgery, Altilio had no significant relief from low back pain, especially as his activity level increased. White indicated that if Altilio had no further recovery from his neck problems, he would have a 7 percent impairment of the whole person regarding the cervical and lumbar regions. That figure approximates about a 14 percent total body impairment, which she characterized as “probably fairly significant, much more so than it sounds.” Referring to Dr. Shawbitz’s March 1989 letter to Dr. Kuhn indicating that Mr. Altilio had no significant neurological impairment or dis *302 ability, Dr. White opined that Shawbitz had given “a good opinion” based on the information available at that time. However, Dr. ■White added that, in retrospect, “we know obviously that [Mr. Altilio] had more problems than we realized initially.”
In videotaped depositional testimony, which the jury heard, Dr. White addressed the question of the need for future surgery:
Q: Let me ask you this, within a reasonable degree of medical certainty, do you have an opinion of whether this man will ultimately have to undergo low back surgery for the problems that he has that you’ve discussed?
A. My personal opinion, looking at his age group and his significant finding is that he will at some point in the future require low back surgery particularly at that L5-S1 level.
Appellee has cited a portion of the record indicating that subsequent to Mr. Altilio’s automobile and lifting accidents, a military review board initially found him to have a 10 percent psychological impairment but no physical impairment. However, a complete picture of the history of the military’s findings indicates that Mr. Altilio appealed that initial rating and in November 1991 received a 20 percent disability rating from the reviewing Air Force Physical Evaluation Board, based on the diagnosis of degenerative disc disease at multiple levels of the lumbar spine with foraminal stenosis at C5-C6.
Appellee relies in large measure on Dr. Shawbitz’s March 1989 medical records suggesting that Altilio was not a surgical candidate and that the bulging discs were not causing pain. We find it significant that only later did Shawbitz learn that Dr. Levine had interpreted the myelogram as indicating the avulging compression fracture. Levine predicted eventual surgery to decompress the L-5 roots at L5-S1, and Shawbitz subsequently deferred to Levine’s opinion that Mr. Altilio will require extensive laminectomy in back surgery. Additionally, Shawbitz initially was unaware that Altilio had undergone a cervical fusion at C6-C7 level. It is noteworthy that when he was deposed in September 1992, Shawbitz deferred to his partner Dr. White, whose treatment continued for nearly two years beyond Shawbitz’s, as to two key matters: 1) Mr. Altilio’s condition or limitations in relation to the car accident and 2) the 7 percent permanent impairment ratings to the neck and low back. In his deposition, Shawbitz stated that he had no opinion of his own as to whether Altilio has a permanent injury, and he defended his prior diagnoses as reflections of how he had felt at the time. He acknowledged that additional information was received after his last treatment of Alti-lio, and he qualified his initial findings by observing that his feelings “may be somewhat different over the long-run ease.”
Having carefully considered the extensive medical testimony and accompanying medical records demonstrating a permanent injury, and indicating the probability of expensive future surgery for Mr. Altilio, we think that the jury’s award of zero for future medical expenses is contrary to the manifest weight of the evidence and is grossly inadequate. Griffis, 230 So.2d at 143. Cf. Butte v. Hughes, 521 So.2d 280 (Fla. 2nd DCA 1988) (zero award for general damages was grossly inadequate and totally inconsistent with findings of permanency and award of future medical expenses). In such instances, the reviewing court has an obligation to act. Dyes v. Spick, 606 So.2d 700, 702 (Fla. 1st DCA 1992).
Accordingly, we AFFIRM IN PART, REVERSE IN PART, and REMAND for a new trial on the issue of future medical expenses and on future damages, if any, relating to the need for future surgery.
BOOTH and LAWRENCE, JJ., concur.